FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
3:55 pm, Apr 13, 2021
JEFFREY P. COLWELL, CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

**STEPHANIE MASSE,**

      **Plaintiff,**

**v.**

**CITY OF CAÑON CITY,**

      **Defendant,**

---

### PLAINTIFF STEPHANIE MASSE'S COMPLAINT AND JURY DEMAND

---

Plaintiff Stephanie Masse ("Plaintiff") by her own accord, hereby submits her Complaint against Defendant City of Cañon City ("Defendant" or the "City") and asserts the following:

### NATURE OF ACTION

1.    Plaintiff brings this action for damages as a result of Defendant Employer City of Cañon City's discrimination based on gender, sexual harassment, and retaliation against Masse for reporting gender discrimination and sexual harassment.

### JURY DEMAND

2.    Plaintiff requests a trial by jury for all counts triable by jury.

### PARTIES

3.    Plaintiff is a female adult citizen of the United States of America who resides in Cañon City, Colorado.

4.    Defendant is a Municipal Government providing government-related

services in the State of Colorado with its principal place of business located at 126 Main Street, Cañon City, Colorado 81212-4215.

## JURISDICTION AND VENUE

5.      This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Masse asserts claims against Defendant under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 (e).

6.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391 (b) because the incidents giving rise to the cause of action occurred within the jurisdiction of the United States District Court for the District of Colorado.

7.      Plaintiff timely filed a written charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and received a right-to-sue letter. All conditions precedent to the institution of this lawsuit have been fulfilled.

8.      The EEOC issues a right-to-sue letter on January 14, 2021.

## BACKGROUND INFORMATION

9.      Plaintiff has a background in Human Resources Management. She possesses an Associate's Degree in Business Management and Marketing. She has more than 30 years of experience as a Human Resources Generalist. Masse is also an experienced painter, website designer, nonprofessional photographer, caterer, and event planner.

10.     Masse was hired by the City to be the Human Resources Director on July 13, 2015.

11.     As the HR Director, Masse was responsible for managing, planning, overseeing, directing and implementing human resources functions for all departments

2

of the City which included but was not limited to recruiting, disciplining, and terminating employees, writing and conducting evaluations, establishing departmental accountabilities including talent acquisition, staffing, employment processing, compensation, health and welfare benefits, training and development, records management, succession planning, employee relations and retention and labor relations.   Masse was also responsible for maintaining all employee personnel files as well as health insurance records. In addition, she was responsible for overseeing the development of and recommended employee salary plans and benefits, including annual adjustments. In addition to her job duties, Masse regularly hosted at her home the annual holiday parties for City employees, took City Council photos as well as a variety of City hosted events. Masse also contributed her time to other extra duties as being asked to develop a recruiting video for the Police Department in which she received an award from the previous Police Chief, Paul Schultz. Masse served on various committees which included Safety Committee Co-Leader. In 2019, Masse was attending classes for credit towards getting certified as the City's ADA Coordinator. Masse was also involved in designing the City's websites, as well as a variety of City sponsored art projects. For her to accomplish this diverse list of responsibilities, she was required to have personal interactions with Tony O'Rourke, City Administrator and Harry Patel, Director of Finance. Masse was also required to work closely with all Department Heads at the City, to achieve her duties, particularly with Daric Harvey, Police Chief, due in part to the police department making up approximately one-third of the total City employee population. Masse met with O'Rourke for weekly meetings on Monday mornings. The City Administrator also hosted a weekly staff meeting that

included all Department Heads to include Masse and Harvey, and administrative staff on Tuesdays mornings.

12.     Almost immediately after Tony O'Rourke was hired in 2016, Masse observed O'Rourke's inappropriate sexual comments. Examples of this were many comments about what Masse was wearing at most weekly staff meetings. At times O'Rourke's administrative assistant would also be a target for his comments regarding her choice of clothing as well.

13.     The inappropriate sexual comments and behavior were so pervasive that O'Rourke and City Council was, or should have been, aware of their existence. The City is a small municipality and O'Rourke was very "hands on" in the community. O'Rourke stayed involved in the daily operations of the HR and Finance areas. After a staff meeting at the beginning of April where O'Rourke had been particularly sexual and brutally derogatory in his comments toward Masse having referenced her clothing decision numerous times in the meeting as well as telling her how unattractive her new orthodontia was.  Masse was visibly upset but tried to hide it and quickly left after the meeting was completed. Masse ran into Ryan Stevens, who at the time was the Economic Development Director, in the copy room. Stevens asked Masse if she was okay and if it bothered her when O'Rourke picked on her such as he just did. Masse commented to Stevens that she laughs at work in front of everyone and cries at home. As a result, O'Rourke observed and allowed Patel to regularly speak to Masse and wave his hand in her face and tell her to "be quiet, he wasn't listening to a girl!" Because Masse was required to work closely with the Finance Director, she could not refrain from any and all contact.

4

14.     Masse asked O'Rourke to refrain from his inappropriate comments on numerous occasions. She would ask openly in staff meetings for him to please stop. She had on every occasion when Patel had an outburst with Masse demand O'Rourke speak to Patel about his disrespectful behavior based on her being a woman. O'Rourke would insist to Masse that it was just Patel's culture to treat women differently and to not let it bother her as Patel means nothing by it. Masse tried very hard to accept the differences of personalities and cultures and tried ignoring the sexual comments and inappropriate behavior. Unfortunately, neither approach had any impact on the frequency of the comments and behavior. Because Masse was required to work closely with the City Administrator to perform her job responsibilities, she could not completely refrain from any and all contact with O'Rourke or Patel.

15.     On June 1, 2017, Daric Harvey was hired as the Police Chief for the City.

16.     Shortly after Harvey was hired by the City, the standing HR/Police Command Staff Meeting was canceled indefinitely after meeting only two times. After the second meeting, Masse reported to O'Rourke she felt Harvey had some type of issue "against women" based on things like how he consistently cut Masse off when she tried to speak, speaking over her when it was her turn to speak and when asking her questions and then just staring at her not blinking during the star. Masse opined that Harvey seemed like he was trying to intimidate her.

17.     However, Defendant failed to take any corrective action against Chief Harvey or any other perpetrators of sexual harassment or discrimination. Instead, Patel and Harvey got treated better by the City Administrator and City Council. Daric Harvey and Harry Patel also received higher than average increases.

18.      April 7, 2018, Cathy Rabe, City Clerk, quits with no notice after 20 years of service. In her resignation letter to the Mayor and the City Administrator, Rabe states she is quitting because she is overworked and cannot stay any longer as her complaints are not being addressed.

19.      Masse informs O'Rourke that she wishes to apply for the City Clerk position.

20.      Defendant informs Masse that she can only apply for the position if she is willing to combine the HR Director and City Clerk positions. She agrees with discomfort and feels it is unfair but wants the promotion and increase in pay, so she applies.

21.      Masse interviews for the position with Councilman Jim Meisner and Councilwoman Dolly Gonzales and O'Rourke.

22.      Masse does not get chosen for the position.

23.      Cindy Foster Owens is chosen for the City Clerk position and transfers from Police Records Clerk to City Clerk without the HR component.

24.      Harvey backfills the Police Records position with a Police Records Supervisor. His choice is Jill Filer. Filer was not chosen from the applications received and Harvey asked Masse to include her. Further Masse was part of the interview for the position along with Foster-Owens and Commander Tammy Wagner, whom all advised Harvey not to choose Filer for the position as she has no experience versus the Records Clerk position she will supervise. They also collectively tell him she is not a good fit. This makes no difference to Harvey and he chooses Jill Filer to fill the vacant

Police Records Supervisor position.

25.    Police Records had continually gotten a low score on the Employee

Survey for being short-staffed and overworked. It was an area that Masse, O'Rourke

and Harvey were continually trying to improve, so making this choice was frustrating to

Masse for sure.

26.    On June 5, 2018, during a meeting that was called due to Masse being

told by Harvey's Assistant at the time, Valerie Lehne, that Harvey had met with Clint

Robertson, a former officer now running for Sheriff, and was now conducting a "secret

investigation" on Masse. O'Rourke did not have any knowledge of the issues Harvey

was investigating. During that meeting Masse asked Harvey why he had an issue with

her. In front of O'Rourke, he informed her he had no respect for her because of the

report she made to the City Administrator after a meeting with them months prior.

27.    Masse asked Harvey how he planned on working with Masse going

forward. Harvey informed her that he hadn't respected her for going to his supervisor,

O'Rourke, with that type of information about him. Harvey informed her that he wouldn't

work with her in the future as Human Resources.  Masse was upset and informed

Harvey she did not make a formal complaint about him at the time, but had made

observations about his demeanor and mannerisms as the new Police Chief and she

shared some of these "red flags" with O'Rourke in what she thought was going to be a

confidential conversation.

28.    Masse was shocked at finding out that O'Rourke had shared her insights

about Harvey with him without her telling her he was doing so. She felt betrayed by

O'Rourke.

29.     Masse also felt that based on this last outburst by Harvey, that her original belief about Harvey discriminating against her based on her gender were not only true but that Harvey had no interest in any type of reconciliation.

30.     Upon the ending of that meeting, Masse was shocked by this admission in front of the City Administrator and told him she wanted to make a formal complaint about Harvey. O'Rourke assured her she was just upset and she was the HR Director and if there was an issue, O'Rourke and Masse could handle it themselves. O'Rourke further explained that "we can't take employee relation issues" to City Council "nor would we ever want to". O'Rourke assured her he would talk to Harvey and he would "take care of it" and "it was going to be fine".

31.     Defendant failed to take corrective action but instead informed Masse that as of July 18, 2018, she would not only not be preparing offer letters for the police department, but the HR Department would now be "decentralized" from the police department.

32.     Masse didn't understand what this change meant and asked for clarification for which there was none. Masse was frustrated over this decision as she felt it was made by the City Administrator without the Council's approval. The decision was in contradiction of the HR Director's job description and Masse was upset as this was another thing she was just supposed to ignore. Masse felt the decision was made in response to her voicing her concerns that she made to O'Rourke about Harvey and what had transpired in the meeting.

33.     Defendant moved forward with letting the police department decentralize from the HR Department which meant the police department was no longer following the policy or procedures set in place by the City Council.

34.     Dolly Gonzales, City Councilman, applies for a new Code Enforcement position on September 5, 2018.

35.     Deana Swetlik, Community Development Director informs the HR Director on September 24, 2018, that she only wants to interview the only applicant with prior experience for that position which is not the applicant Gonzales.

36.     O'Rourke was in South Africa on vacation during this interview process, but upon his return informs Masse to schedule an interview with Gonzales immediately.

37.     Masse informs Swetlik of the interview with Gonzales to both of their dismay as Gonzales clearly has no experience and also informs the group in her interview that she would like to get the Code Enforcement position so she can ticket her neighbor. Gonzales felt she should have the position because of her time on City Council. Both Masse and Swetlik were frustrated at the clear conflict of interest in this hiring process. They joke to each other about being frustrated but at least they "weren't forced to hire Gonzales".

38.     Masse complains to O'Rourke about the inequities between herself and the male Directors, particularly Harvey and her. For example, being assigned heavy workloads with extra duties that were not included in her job description but seemed to get assigned due to being a female such as cooking for holiday parties, prepping refreshments for the tree lighting and creating designs for parade floats and include

9

other women to help with cooking and always clean up.

39.     O'Rourke informs her that her assistant would be "delighted" to take over

those duties because "he's good at stuff like that" and informed me "he should be, he is

gay!"

40.     Masse complained to O'Rourke about his inappropriate comment and his

"lack of attention in these matters" and that things around the City were getting worse

for her each day as well as all the other employees complaining. Masse further

complained about inequality between her and Harvey and stated, "Council stays

unhappy with her no matter what good work she does" and "loves the Chief while he

can't even handle completing one performance review for even one of his staff

members and nothing happens to him. He is always the hero!"

41.     Masse suggested to Defendant to create a "party committee" to alleviate

her of these extra duties.

42.     O'Rourke agreed but continued to assign these types of duties and

restricted Masse from having any committee members do much of the work or party

preparation. This included the retirement party for Harry Patel, George & Pam

Stepleton.

43.     Masse asked O'Rourke what could be done and what was going to be

done for the women that have complained and mostly including Masse herself.

44.     O'Rourke assures her "he will take care of it' but doesn't.

45.     January 4, 2019, Jim Meisner, City Councilman, requested additional

information from the salary survey in relation to the HR Director position wage being potentially increased. O'Rourke instructed Masse to put together a memorandum to be presented to City Council showing how the data was acquired and made suggestions of what data should be included. A data point she was asked to gather was a comparison of comparable sized Cities' HR Departments' to employee ratios.

46.     The data collected showed the City's HR Department was short-staffed. The consent agenda with this information was presented. The consent agenda gets approved by City Council to adopt the new salary scale which includes the proposed market pay increase for the HR Director at the City Council Meeting on January 7, 2019.

47.     Masse attends this City Council meeting and sits next to Stevens. She asks Stevens for clarification if the memo got approved.  Stevens confirms it was indeed approved.

48.     O'Rourke informs Masse in the days after this meeting that she will not be receiving the recently approved market adjustment due to "the Mayor and City Council having issues" and "Council doesn't want any Directors getting any more money than the standard merit pool increases".

49.     Masse complains to Defendant and states that all market increases have been granted in the past. The City's standard practice has been for all employees to be within the salary range for their position. She states that she will be the only employee in the organization that will be out of the salary range for her position. She states she is is a female over 40 and male managers were getting some large amounts. She explains to O'Rourke that he is putting the City at risk and she is struggling with this decision as

11

feels she is being targeted by the City Council.

50.      O'Rourke assures her he will "make it right".

51.      Masse meets with the City Administrator for her oral performance review on January 14th. All Directors were told to schedule their oral performance review meetings with the City Administrator through his assistant, Denise Warren, within the next week after being told at the staff meeting of January 8th.

52.      During Masse's performance review meeting on January 14th, O'Rourke informed Masse that he was able to "get her" the market increase but she had to agree to a zero percent merit increase. Masse was upset but still happy she was getting a pay increase because up to that point she thought she was getting nothing.

53.      O'Rourke reassured Masse that it had nothing to do with her performance but because the market increase was significant and therefore he could not "sell it to Council" because the amount of increase would be such a high amount.

54.      Masse stated she understood but disagreed with the decision, but she would try to "get past it". She stated she felt it was unfair because Harvey seems to "get accolades even after he screws up" like signing the contract to sell a City building that he was not authorized to sign and still gets a high increase'.

55.      She was told in the next days by O'Rourke that Harvey and Patel were both once again getting increases higher than the merit pool percent, and this was contrary to what was she was told previously.

56.      O'Rourke stated again that he was working on things behind the scenes

and just to stay committed and assured her that he was "happy with her work" and for her "not to worry". He stated there are two sides to each story and he will keep letting the Council know her side. He then advised her to "keep a low profile" and to "stay away from the Mayor and Ashley Smith". He further went on to advise Masse that he thought it be best for her to "stop taking complaints from the girls" and to "stop mother-henning" them to let them "start running out in the road!" Masse was shocked and asked him , "What do you want me to do then?"

57.     Defendant replied to Masse "Let them get hit!" The City Administrator was referring to Masse's complaint of two more female officers, Athena Garcia and Robyn Vidmar, coming forward to make complaints about Harvey directly to O'Rourke.

58.     Garcia requested a medical leave under FMLA. Garcia complained to Masse first and then followed up with O'Rourke about being questioned about her requested medical leave by Harvey. She questioned Masse on if she would be employed upon her return from leave. She felt she was a victim of hostile work environment due to her being a woman by Harvey. Garcia informed Masse that she feared being terminated and feared for Masse's termination as well.

59.     Garcia requested a medical leave of absence under the FMLA on November 15, 2018. The same week Garcia was questioned by Harvey on the necessity of the leave. Masse informed Harvey of the appropriate procedures regarding Garcia's leave and that the HR Department would work with the employee directly.

60.      Harvey sends a form to all employees via Jill Filer for all police department employees to provide all outstanding medical issues of sworn and non-

sworn employees on November 29, 2018.

61.      Masse contacts Harvey informing him to discontinue to the use of the form as it violates privacy laws under HIPAA. Concurrently, Masse emails Katheryn Sellars, Co-Counsel for the City, and asks about the legality of the form.

62.      Sellars confirms there is a violation and requests a meeting with the City Administrator, Chief of Police, Human Resources Director and herself.

63.      O'Rourke and Masse agree to meet but the meeting does not happen.

64.      February 14, 2019, Masse gets a phoned complaint from Valerie Lehne, Crime Analyst, complaining she feels Harvey is treating her differently than other police employees and feels he is retaliating against her because he thinks she has complained to Masse about him.

65.      Masse relays this complaint to the City Administrator. O'Rourke states he will talk to Harvey after he speaks to Lehne to hear her complaint directly.

66.      February 25, 2019, the City Administrator informs Masse of a reorganization of the Code Enforcement Group under Deana Swetlik to Neighbor Services.

67.      March 1, 2019 – Chief Harvey hires Elliot VanDyke, previous co-worker from Florida to Detective and Tracy Swearingen to Sergeant. Both are rumored to be Harvey's friends.

68.      Both were not hired into their positions under standard police procedures and employees complain to Masse and O'Rourke. Pete Elliot is one of these complaints

on March 15th. Elliot has complaints about Harvey discriminating against women and retaliation toward Elliot by Harvey due to his complaints. Masse listens to the complaint but asks Pete Elliot if he would be willing to talk to O'Rourke directly as Masse was instructed not to take their complaints directly.

69.    Elliot agrees and complaint of hostile work environment treatment such as being threatened by Harvey.

70.    Valerie Lehne meets with O'Rourke later that same day to make a detailed formal complaint about Chief Harvey that includes but not limited to retaliation, favoritism, failures at the department and rumors. The rumors include a story of Tammy Wagner, Commander and Jill Filer, Police Records Supervisor, being regular guests at Chief Harvey's house and "hot tubbing while drinking Jack Daniels and smoking cigars" while his wife is out of town and still living near Vail, Colorado.

71.    March 20, 2019, Filer contacts HR Assistant, Kevin Cundiff, inquiring about in-network vs out-of-network benefits and begins asking about a procedure she is planning on having in approximately five months and using leave in August of 2019.

72.    Defendant asks Masse to post and begin the hiring process for a new Business Manager position for the police department since the department was struggling to prepare and maintain the departmental budget. Further, Harvey requested a Business Manager with human resources experience but specifically with law enforcement HR experience. He stated again that since Masse's human resources experience was outside of law enforcement, she was unable to "understand the needs of the department". Since the decision to "decentralize" HR, hiring, employee relations,

15

and other areas of the department were being mishandled, lost and/or not getting completed at all.

73.    Masse started recruited a woman, Jessica, with 16 years Human Resources in law enforcement at the Federal Bureau of Investigations experience as well as years of experience doing the budgets for those same agencies.

74.    April 2, 2019 – Masse meets Brittney Lynch, Police Records Clerk and Valerie Lehne for lunch to listen to Lynch's complaints about her direct and indirect supervisors, Jill Filer and Tammy Wagner. Lynch explained that she had been given the entire workload that was intended to be split between the Records Clerk and the Records Supervisor, Filer. Lynch explained that Filer "doesn't do any work", "complains about working", "refuses to get trained", and "sits in Harvey's office behind closed doors". Lynch complained that Wagner not only lets this type of behavior happen with Filer, but participates in the closed-door meetings with Harvey and Filer as well. Wagner threatens Lynch with and delivers Corrective Action Notices regularly which are not required to be sent to the HR Department as they are not considered "write-ups" or to be used as a threatening tool but more as talking points for supervisors to discuss with subordinates informally. These notices do not get filed int their personnel file. Lynch informed Masse that is not how they are treated at the police department and that she had received as many as 11 of these notices. Lynch also informs Masse that she has to listen to their conversations at the office about how they "partying at the Chief's house over the weekend" and "hot-tubbing" and "drinking" and "smoking".

75.    Masse informs O'Rourke about this discussion with Lynch and Lehne.

16

76.     O'Rourke informs Masse to contact the Business Manager applicant, Jessica, and ask if she can interview for the position the next day. O'Rourke asks Masse to bring her in for an interview immediately and before the position is posted. Masse advises O'Rourke to wait until the position was posted.

77.     O'Rourke declines and proceeds with the interview with Jessica on April 3rd and includes O'Rourke, Harvey, Tammy Nordyke, new Finance Director, and Masse.

78.     April 4, 2019, Pete Elliot, Police Officer, resigns due to frustrations with and threats from the Chief.

79.     Athena Garcia resigns from the City with reluctance on April 5, 2019 over frustrations with the Chief and details in her resignation letter how she was felt retaliated against by the Chief and no longer wanting to work in a hostile environment.

80.     April 5, 2019, O'Rourke makes another sexual and derogatory remark about women in front of a group of almost one hundred people that were in attendance at Harry Patel's retirement party. The guests included City employees, Department Heads, Harvey, Ashley Smith, myself and outside invited guests such as Debbie Bell, female Fremont County Commissioner.

81.     The comment made by O'Rourke was about Patel being sad because he will no longer "be surrounded by the harem of women" that he had "gotten accustomed to being able to tell them what to do".

82.     This comment prompted Debbie Bell to comment to a City employee next

17

to her saying, "He just can't help himself, can he?"

83.     After Patel's party, Masse complained to O'Rourke over text and followed up with him at their meeting on Monday, April 8, 2019. In that meeting, Masse complained again that she was frustrated that she was put as the new "event planner" while her real duties kept getting stripped away. She demanded that she not be part of hosting and cooking for these types of events. Masse had also been complaining about the stress of the situation taking a toll on her health and again told the City Administrator of the drastic weight loss she was suffering due to her stomach being "so tied up".

84.     April 8, 2019, Kevin Cundiff, Human Resources Assistant, meets with Masse to inform her Harvey had asked him to apply for the Business Manager position.

85.     Masse is surprised by this as Cundiff is not qualified for the position. Cundiff was struggling in his HR role at the time and was in the process of transferring back to the Finance Department.

86.     Masse informed O'Rourke of this new information.

87.     O'Rourke informed Masse that Harvey had "gone over his head" to Mayor Pro-Tem, Ashley Smith, to complain about Masse the night before. O'Rourke told Masse that Harvey was no longer "in his circle of trust". O'Rourke had stated that Councilman Jim Meisner received a call from Harvey to complain as well, but Jim Meisner informed Harvey that he "had friends in the police department" and he was "well aware of Harvey's issues".

88.     O'Rourke meets with Harvey to discuss these latest issues but there is no follow-up with Masse.

89.     April 11, 2019, Masse and Swetlik are informed by O'Rourke that the Neighborhood Services group will now be moved under Harvey at the police department and Swetlik will no longer manage the group. As well, the open Neighborhood Services Officer position will now get filled as a higher paid Neighborhood Services Supervisor.

90.     March 27, 2019, Councilwoman, Amanda Cochran, is offered by Harvey the Neighborhood Services Supervisor.

91.     Masse is on vacation for spring break during this offer process being handled by HR Assistant Cundiff after Masse specifically gave Cundiff instructions to not hire anyone in the one week that Masse would be out on vacation.

92.     Masse informs the City Administrator of the problems surrounding this hire; the biggest being that Councilwoman, Amanda Cochran is not at all qualified for the position.

93.     One week before Amanda Cochran is supposed to start in her new position with the City, Frank Juaquez, Councilman, meets with O'Rourke and informs the City Administrator that he cannot hire Councilwoman Cochran into a position with the City as it is against the Charter.

94.     O'Rourke informs Masse to halt the hiring process immediately. Masse is relieved at the discovery of the charter rule as Amanda Cochran has little to no actual work experience other than working as a postal clerk and volunteering at the local animal shelter.

95.     Masse and Swetlik both felt this was a "deal" between Harvey and

19

O'Rourke since Councilwoman Amanda Cochran had no experience in that type of position but moreover, not much work experience at all.

96.     This seemed contrary to Masse since she and Swetlik made a recommendation to Council as the position was needed at the City and Council agreed that there was much work to be completed in the community and the position needed to be up and running immediately to keep up with all the good work that had already been started up to that point. In addition to this, the new Business Manager that was approved for the Police Department that Masse was instructed to take to Council to get approved has now been "pulled" and no longer will be needed.

97.     Masse is now asked to contact the qualified applicant to tell her the City has "gone in a different direction". The candidate is a 16-year veteran in Human Resources for law enforcement officers and comments on the phone that she saw problems with Harvey in the interview. Masse gets off the phone immediately as this applicant was a recommendation by Mayor Preston Troutman and Masse is nervous that he is now going to be upset about this decision.

98.     April 1, 2019 – Masse texts O'Rourke with an offer letter signed by Jill Filer, the Police Records Supervisor, as she does not have authorization to do so. Masse also explains the offer letter is filled with errors and needs to be corrected. Masse contacts the new employee and schedules her to stop by the HR office to sign the corrected offer letter. When the new employee didn't show up as she agreed, Masse contacted her and was told that the employee instructed to not attend that meeting by Filer.

99.    Masse keeps O'Rourke aware of this and continued to make O'Rourke aware at how many times Filer was emailing Masse and Cundiff and calling with questions and asking for items that were available for her to find on her own such as City policies. Filer wanted Masse to "jump through hoops" for her and she made O'Rourke aware of this.

100.    O'Rourke was aware and stated he wanted Filer fired and it was one of the worse hires that Harvey could have made. O'Rourke was aware of her inappropriate behavior and acknowledges to Masse that Filer and Wagner are there to "make things difficult on her". O'Rourke again reassures Masse that he is confident it will all work out as there are emails back and forth showing the types of questions and problems being asked of Masse by Wagner, Filer, Swearingen and Duncan. O'Rourke advises Masse to "just keep answering their questions to the best of her ability".

101.    April 12, 2019 – Masse receives a complaint from Patrick Mulready, City Planner stating that his supervisor, Deana Swetlik, is a micro-manager and if something isn't done immediately, he will quit.

102.    Masse informs O'Rourke of Mulready's complaint and he states to Masse that he will not have anyone report to Swetlik any longer. Masse informs him that he can't just keep taking duties away from Swetlik and herself and "expect problems to get solved". Masse informed O'Rourke that he is "creating problems that don't need to be created".

103.    Masse informed O'Rourke and he is aware and acknowledges her health issues with her. On April 12, 2019, Masse requests a meeting with O'Rourke to tell him

again that she is concerned about her health issues and the drop in her weight due to stress.

104.    O'Rourke laughs at her and states, "I don't know what you're complaining about, you should be happy you're so much thinner now and looking really good!"

105.    Hoffmann recommends to the City Administrator and City Council to hire a third-party to investigate the complaints about Harvey and the climate at the police department.

106.    April 17, 2019 – Third-party Climate Assessment interviews begin at City Hall over the next days. Most everyone from the police department is interviewed about their feelings about their job and their supervisor(s).

107.    April 18, 2019, O'Rourke holds a meeting with Swetlik, Stevens, Mulready and another direct report of Swetlik's and informs the group that all the people in the room will now start reporting to the City Administrator directly.

108.    April 24, 2019 - Swetlik files a formal complaint about the City Administrator, complaining about the April 18th meeting and how she feels she is not treated fairly by O'Rourke.

109.    Masse contacts Corey Hoffmann but she is told he cannot speak to her without prior authorization from O'Rourke.

110.    Masse informs O'Rourke of this exchange and instructs Masse to contact Hoffmann again but this time to tell him that O'Rourke said it would be okay for him to talk to her about the complaint.

111.     Masse emailed the complaint and the requested job descriptions to Hoffmann and then met with Swetlik to start to investigate her complaint.

112.     April 25, 2019 – Harvey calls Tim Bell, Police Sergeant, to meet him at the Bean Peddler to discuss rumors of possible criminal activity of another female Police Sergeant, Corie Ames divulging information about two undercover officers, Elliot Van Dyke and Jordan St. Louis in regards to having their "cover blown" by Sergeant Ames giving that information to another agency, the Fremont County Sheriff's Office, which was false as the truth about the matter came out later to Masse.

113.     April 25, 2019 – A story is "leaked" to the Pueblo Chieftain regarding a group of officers making complaints to the Cañon City Administrator, Tony O'Rourke.

114.     April 27, 2019 – Commander Robert Hill files a formal complaint about Chief Harvey to O'Rourke.

115.     O'Rourke instructs Masse to send any and all complaints to Hoffmann directly from that day forward.

116.     Masse follows up with this directive and sends all complaints to Hoffmann to include Corie Ames, Robert Hill, Tim Bell & Cindy Foster-Owens.

117.     April 28, 2019 - Kevin Cundiff, HR Assistant, transfers from Masse's department back to Finance as a Senior Accounting Technician which is a lateral move. Due to Cundiff's lack of background in HR and errors he was making in the Human Resources Department, he informed Masse that due to his lack of experience she needed in the department, he felt more comfortable back in the Finance group. Masse

23

was relieved at this as Cundiff came to the City as a recommendation from O'Rourke and Masse felt she "had to find a place for him".

118.    April 26, 2019 – O'Rourke asks Masse to calculate the turnover for the police department going back to 2015 as Hoffmann has reached out to O'Rourke to tell him the Climate Assessment Report is "in" and will be presented but the information being reported is a contradiction to the complaints received. O'Rourke tells Masse he is suspicious about the findings of the report and texts Masse that he does not trust the findings. O'Rourke states to Masse that he no longer trusts Corey Hoffmann. O'Rourke tells Masse that Hoffmann has told O'Rourke that he thinks the report "isn't as bad as what we were all thinking". O'Rourke complains to Masse that he has concerns that the report is "coming in watered down" and he requests her to work through the weekend pulling together information showing the correct data in contradiction to what false information could be presented.

119.    April 29, 2019 – Harvey sends over a 6-month review form for Filer. She is eligible for up to a 2% increase after 6 months according to City Policy. Harvey has made a recommendation for a higher percentage of increase than what the policy allows and Masse sends the form back to Harvey for correction.

120.    May 1, 2019 – Corie Ames emails Masse with a question about how to go about filing a formal complaint and lawsuit against Chief Harvey for gender discrimination and threats of retaliation.

121.    May 1, 2019 – Masse contacts Mike McGhee at the City's insurance broker's office to get the City's short-term disability plan amended. The update will be to

change the current 45-day waiting period to a 14-day waiting period. This was changed and approved by Council in 2017, but the contract was inadvertently never updated to reflect the approved change.

122.    May 1, 2019 – Masse speaks to O'Rourke and informs him of the error and after complains again of health issues and massive weight loss due to stress. She informs O'Rourke she is stuck at home due to vomiting and having diarrhea at the same time and is concerned and cannot come into the office. She reminds him that she had worked all hours through the weekend pulling together his reports and she was now really sick. Masse was working at home but was frustrated when O'Rourke texted her "he knows she has medical issues but the bs environment we need to be at City Hall as much as possible to avoid more criticism".

123.    May 1, 2019 – Masse asks O'Rourke for an accommodation to be made for her to work at home during these types of medical-related episodes.

124.    May 1, 2019 – Sergeant Corie Ames walks off her job and gives two-week notices but asks Masse if she can be paid out her notice as she is filing a formal complaint of sexual discrimination and sexual harassment and retaliation against the City and Chief Harvey.

125.    Masse texts O'Rourke at 2:51 pm asking if this request for notice can be paid out to Ames. O'Rourke does not answer until 4:01 and gives the approval for payout.

126.    Shortly after this text exchange, Masse receives a phone call from O'Rourke stating, "They just fucking fired me and you're next!"

127.     Masse is very rattled by the phone call and receives an updated complaint from Ames and forwards it directly to Hoffman.

128.     May 2, 2019 – Masse was asked to meet to discuss the events of the previous day. She agreed and met with Ryan Stevens, newly appointed Acting City Administrator, Ashley Smith, Mayor Pro-Tem and Preston Troutman, Mayor. Masse first asked if she could speak freely. She was assured by all that she could. Masse started from the beginning and told that group of her complaints at length with Daric Harvey.  Assuming Masse was to be terminated for no cause, she was emotional and asked the group if their intent was to fire her and should she just resign so there wouldn't be any "game playing". She explained how she had good performance and kids in college and it was important she knew her next check would be in the bank. Since O'Rourke had warned her of this the previous day, Masse informed Ashley Smith that O'Rourke had told her that Smith had made a comment during the Executive Session of April 24th, that she said, "Masse should be fired". Masse further explained of her medical issues related to the stressful situation at the City and again informs the that she had lost over 50 pounds in a few months and was concerned that the weight loss was continuing. The group also commented on Masse's dramatic weight loss as well.

129.     Preston Troutman further opined that he was disappointed that O'Rourke told Masse anything so negative and that Preston Troutman liked Masse and had no intent of firing her and that the termination of O'Rourke was an isolated incident, specific to O'Rourke. The meeting further went on directing Masse to "keep the troops spirits up" and to keep them informed of anything negative in regards to the employees.

130.     Swetlik complained to Masse on May 2nd of the Council's decision to appoint Stevens to "the seat" due to her strong feelings that Stevens and she did not have a good working relationship and things would not go well for her under Stevens' supervision. She stated that she was very fearful of the future. She also stated in an email that anything O'Rourke had put in place in her department should be put on hold.

131.     Masse informed Stevens of this communication exchange the same day.

132.     Stevens asked Masse how she thought he should handle this situation with Swetlik as she is a difficult person to deal with. Masse recommended Stevens start by being honest with her and tell her that people have indeed complained as opposed to O'Rourke telling her that no one had complained.

133.     Stevens was aware of the complaints as he was one of the complainants.

134.     May 2, 2019 – Police Officer, Jeff Canada, calls to complain about the unfair treatment of Sergeant Ames by Chief Harvey.

135.     May 8, 2019 – A CORA request is sent to the City Clerk's office from KRDO News Channel 13 asking for all anonymous reports received by the City Administrator.

136.     Masse via Katheryn Sellars, Co-Counsel for the City, advises that the City is not in possession of any "anonymous" complaints.

137.     May 8, 2019 – Stevens' instructs Masse to set up interviews with the employees that have complained. Stevens' states that the same third-party that did the Climate Assessment has been brought back in to investigate the complaints and Masse will not be needed to deal with those complaints.

138.    Masse complains to Stevens and explains that this "feels like more of the same" and shares with Stevens that she does not trust Hoffmann. The reasons she gives are first for complaining to Hoffmann directly about Harvey, O'Rourke strong feelings of mistrust and Hoffmann himself telling Masse on more than one occasion that "he will not be getting into the middle of their fight" and he works for City Council. She further complained that he does not work with her when she does call to ask questions regarding employee relations. She explained that Hoffmann has never been helpful to her in comparison to her experience with other "corporate-type" attorneys and maybe she didn't understand what Hoffmann's true role was. Similarly Masse felt Hoffmann didn't care about her complaints and didn't care about anyone else's complaints because it seemed clear to Masse that Hoffmann was in the "Harvey Camp". Masse informed Stevens that she asked Hoffmann thought about Masse making a formal complaint as the others did to protect herself. When she spoke to Hoffmann about it, he informed her that it didn't make any sense because she did not work for Harvey.  Further, she spoke to Hoffmann about Chief Harvey not doing what he was told regarding the centralization of all personnel files to be at City Hall. Additionally the form that violated employees' HIPAA rights that she had informed Hoffmann about months previous was still being used at the police department. Hoffmann told Masse he was sure Harvey was doing things correctly because he had been the Lieutenant for Vail, Colorado and Hoffmann's college friend/roommate is the City Attorney for that municipality and he is sure they kept all the files centrally located with Human Resources and that his friend would not have allowed it. Masse explained to Stevens that a new form was never sent and Lehne can corroborate that information.

139.   Masse complained to Stevens that her entire job description didn't make sense anymore and she wanted someone to explain what she was supposed to be doing now.

140.   Stevens reassured her that he was aware of the problems and he was "there to help".

141.   Masse is asked to reach out to Corie Ames to inquire if she is willing to participate in the complaint process with the third party.

142.   Ames explains that based on the advice of her attorney that she will not participate. She went on to complain that she has already complained to the third party to no avail. She states, "They hadn't done anything when she complained to them before so why would she trust them again?"

143.   Masse emails Stevens that she is attending a funeral and will not be back in the office as she is again having stomach issues since she got home.

144.   May 16, 2019 – Rebecca Nelson, Accounting Manager asks Masse if she will sign the pension plan contract for the City's 401(a) Plan. Masse explains to Nelson that signatures on contracts have to be signed by the City Administrator or Mayor and needs authorization from Council to do so.

145.   May 17, 2019 – Masse has a meeting at the police department and Masse notices Kelly Duncan, Neighborhood Service Supervisor, is training two new employees in her department. Masse was unaware of their start date and asked Duncan why they were working without paperwork, backgrounds, etc. Duncan informs Masse that they have indeed started but neither have completed any new hire paperwork because they were "waiting to be processed through Human Resources". Masse informs Supervisor

Duncan that she needs to communicate that need and no longer bring people in without using the HR office.

146.     Masse asks Chief Harvey why she wasn't informed about two new people starting at the City in order to get them "set up" appropriately in the Neighborhood Services Group.

147.     Harvey apologizes to Masse and agrees he had hired them without doing any paperwork and states, "My bad!"

148.     On the same morning, Masse was at the police department due to Brittney Lynch, Records Clerk, called in tears to Masse complaining of the hostile environment she was in with Filer and Wagner. Lynch complains that she feels the group wants her fired and she is the only employee doing any of the work. Lynch goes on to complain that she is getting "written up" for not training her supervisor in Records but complains that Filer is never working and always in Wagner or Harvey's office. Lynch complained that she didn't get the supervisor position when she was the only candidate with experience and now why was she in charge of training her own supervisor?

149.     May 19, 2019 – Masse informed Stevens of her planned and upcoming vacation over the Memorial Day weekend.

150.     Stevens asks if she can reschedule her vacation as he has been so stressed the previous two weeks with all the changes and would like to take the time off with his family instead and did not want to leave the office unattended.

151.     Masse raised her eyebrows in this surprising statement by Stevens and explains that she is needing the time off and is frustrated with Stevens and Hoffmann

because they don't seem to be taking her seriously or do not seem to want to help and now Stevens is complaining about being overwhelmed after only two weeks.

152.    She further explains to Stevens she is still upset that no one has addressed Chief Harvey and his group stating to employees that "Masse is the real Witch" in what Harvey kept describing the Climate Assessment as a "Witch Hunt". She informed Stevens that she was even more upset at hearing that a new police officer that she had just met with was reported being overheard saying, "Masse is a fucking Cunt!" to Harvey.

153.    Masse reminds Stevens that Filer is heard in recorded meeting with Harvey provided by Sergeant Tim Bell stating Masse would not let Filer discipline her employee, Lynch, due to Masse liking Lynch, which is false as Masse has never spoken to Filer about Lynch's performance.

154.    Stevens instructed Masse via email to put together her bulleted list of complaints and send them to him so he can start working on them, which she did.

155.    Swetlik informs Masse she feels her job was in jeopardy and has no trust in Stevens or Hoffmann's abilities. Within a few days of that discussion, Swetlik turns in an FMLA request but gives it directly to Ryan on May 20, 2019 when Masse was not available and out of her office.

156.    Stevens informed Masse that the decision had been made to potentially eliminate Swetlik's position and/or offer her a lower and less paying position and not address the difficulties.  Stevens suggests we "get on a call" with Hoffmann so we are all "on the same page" and it was important to Stevens that we were getting a "fresh start" with Hoffmann. Stevens also felt it was necessary in handling this sensitive and unique FMLA leave request from Swetlik. Masse complains to Stevens that it feels like

everything is just starting at the beginning again and he is ignoring what is happening and Masse asks where she is supposed to go to make complaints. She informs him that she has been told repeatedly that she cannot go to Council as they do not handle employee relations matters and the City Attorney works for Council as Hoffmann never lets her forget and still leaves her with nowhere to go to make a complaint that Masse is feeling discriminated against by Chief Harvey due to being a woman as well as having medical issues that no one cares about and won't address.

157.    May 21, 2019 – Masse sends a list of issues/complaints requested by Stevens. Masse meets with Stevens to make sure he received the list.

158.    Ryan informed Masse of the meeting he set the next day with Hoffmann so the three could be "on the same page" and requests the complaint Swetlik filed with O'Rourke.

159.    In the meeting of May 22nd, Hoffmann started by explaining to the group what his role is at the City. Masse attempts to share her frustrations in dealing with his legal office and feeling like there hasn't been much help for her. Hoffmann explains that he will not be used as a pawn in the "fight between the Chief and her". Frustrated, she agrees to participate in the suggested mediation as he previously discussed with Stevens. Masse was not hopeful that this was a solution in as much as check box for the City to mark off in order for Masse be terminated.

160.    In that call, Swetlik's leave is also discussed, and it is suggested by Hoffmann that Masse draft a letter showing the City's engagement in the "interactive process". Masse utilized the federal forms provided by the US Government and followed as closely as she understood the FMLA process through her experience and the

discussion of May 22nd. She further shared all the Swetlik's FMLA details by emailing the correspondence and communications, as well as an outline of a conversation that took place on June 6th between Masse and Swetlik as well as a copy of the WH-381 Form sent. Hoffmann suggested Masse write a letter but Masse used the WH-381 as the interactive form. Masse was instructed by Hoffmann to draft a letter to Swetlik, having Hoffmann review the letter and then place the letter on Swetlik's desk thus bringing the FMLA matter with Swetlik to a close as Hoffmann and Stevens stated that this was sufficient way to bring the matter to a close as of June 14, 2019.

161.     Defendant did not address any of the issues/complaints at the Hoffmann meeting and nothing was addressed from Masse's emailed list of complaints other than the signing of offer letters will now be completed by the City Administrator only.

162.     Masse complains to Tammy Nordyke, Finance Director, about her medical issues related to the workplace and her concern over her weight loss.

163.     Tammy Nordyke tries to encourage Masse to go see a doctor but Masse tells her she is too scared to go and she does not have a physician in the area.

164.     June 7, 2019 – Masse has a meeting with the Command Staff of the Fremont County Sheriff's Office at the Bean Peddler on Main Street with Sheriff Allen Cooper, Under Sheriff Derek Irvine and Commander Jeremy Green. As a courtesy, Sheriff Allen Cooper informed Masse of a rumor that had been circulating and was getting some attention. All at the table shared their concern over it being now well-known that the Cañon City Police Chief, Daric Harvey, was regularly "hot-tubbing" with two female members of his staff, Commander Tammy Wagner and Records Supervisor, Jill Filer, while "drinking Jack Daniels" and "smoking cigars". Masse asked the group how

could people think this was true? Derek Irvine stated that people had been driving by Harvey's house and they can see the hot tub and the people and Commander Wagner was staying on Harvey's property in a camper while she was waiting for her husband to move to Colorado from Florida where Tammy had just relocated from.

165.     Masse was aware of these rumors from many of our own City staff but now hearing them from an outside agency was frustrating and embarrassing to her as a representative of the City. She thanked the group for the "heads-up" and relayed this information to Stevens first thing the following Monday morning.

166.     When Masse entered Stevens' office to ask if he had time to talk to her, he informed her that Harvey was on his way over for his weekly meeting. Masse showed some frustration and raised her voice at this information due in part that Monday morning historically had been Masse's weekly meeting with the City Administrator. More frustrating was that Masse not only lost her meeting day and time but was never given a new meeting day and time with Stevens.

167.     In the minutes before Harvey arrived Masse explained what the Sheriff's Office had told her that past Friday. Stevens seemed more upset about her frustration over the meeting time than the upsetting information that she just shared. Masse further explained to Stevens of her concern about the City's reputation and inquired if he thought it was an issue? Stevens seemed to be unaffected by what I had told him about the Sheriff's information when at that moment Harvey showed up and Masse did not want Harvey seeing her upset, she quickly removed herself.

168.     June 11, 2019 – Masse receives the resignation letter from Brittney Lynch outlining in detail the problems with Jill Filer, Commander Wagner and Chief Harvey and why she is resigning her position.

169.     Lynch inquires if she can be paid out her notice due to all the conflict with her resignation.

170.     Masse seeks approval for this from Stevens but is turned down.

171.     June 12, 2019 – Masse receives two emails from Stevens. The first email sent was a meeting request with Stevens on 6/13 in the morning and another meeting request with Jody Erickson, JSE Associates, the mediator, on the same Thursday afternoon.

172.     June 13, 2019 – Stevens and Masse meet in Stevens' office to discuss the information she received from the Sheriff and shared with Stevens previous Monday. He informed her that he had also "heard these same rumors" and he felt Masse was perpetuating them by telling him. He expressed his frustration because he stated that he met Commander Wagner and he knew she was a married woman because he had met her husband.

173.     Masse was surprised by his reaction and immediately explained that she was not informing him as a "dirt topic" but as the Acting City Administrator and that she would never "perpetuate rumors". She informed him that if he did not want her to share as she was instructed on May 2nd by Preston Troutman or again at the Leadership Retreat just days before when Councilman Jim Meiser, then she wouldn't. Masse said, "But now I really have nowhere to complain of the inequalities at the City". She further explained to Stevens that this is the type of information can suddenly or over time

deteriorate the morale of its employee population and/or potentially its citizens; and if she needs to refrain from sharing this type of information, she would certainly do that to the best of her ability but it really restricts her on doing a good job as a Human Resources Director for the City.

174.    Masse explained to Stevens that she didn't feel this was fair at all as shared her discomfort with Harvey "having regular weekly lunches with Councilman John Hamrick, but yet she is not allowed to speak to the Council about issues? Why?" She asked what was happening with the complaints and if the City was even investigating them as she was being "kept out of the loop".

175.    Stevens assured her that he was hopeful for mediation that afternoon and she could tell the mediator her complaints to Jody Erickson as well and that she should feel comfortable with sharing.

176.    Later that same day and before mediation, Stevens stopped by Masse's office and stated that he indeed wanted her to share rumors with him. He stated that he really did understand her frustrations with Daric Harvey and wanted to help. He shared that he too was having issues and could see what Harvey was doing as he was doing some of the same things to Stevens.

177.    The mediation meeting started just around 2:00 pm and lasted about one hour and 22 minutes. This meeting was recorded by Masse and informs the mediator, Jody Erikson from JSE Associates, over 6 times that she was a victim of sexual discrimination, sexual harassment and retaliation by Chief Harvey and the City due to being a woman.

178.    June 14, 2019 – Lynch calls in sick but instead receives a text from Chief Harvey that she is terminated effective then and "not to bother coming back in".

179.    Masse complains to Stevens about the disparate treatment of Lynch which ended with Filer dumping all of Lynch personal belongings from her desk into a clear trash bag that included her plants, pictures and personal affects and was dropped off at Masse's desk by Police Sergeant Steven Huskey as not appropriate. Stevens agrees that it wasn't appropriate for Filer to do but says nothing more about the issue and there is no consequence for Filer.

180.    June 18, 2019, Masse arrives in her hotel room with her husband at the CML's Annual Conference in Breckenridge. She immediately receives an email from Stevens asking her about a disability claim for an employee, Jill Filer, Police Records Supervisor. Stevens is accusing Masse of ignoring Filer's claim since the middle of April. Stevens' email opined that although Masse may have an opinion of Filer as an employee, that she should still be proactive.

181.    Masse was so visibly upset after receiving this email that her husband asked her what had happened and had to console her. After she calmed down, she called Stevens directly and told him how disappointed she was in his unprofessionalism and asked why he would say such an untrue thing about her in an email that is now part of a permanent record that could potentially be shared publicly? She explained that she would never withhold benefits based on an opinion and certainly her opinion about Filer needing to be fired, would never stop her from helping that employee. Masse told Stevens that she and her assistant agreed that Filer and Wagner were definitely playing games due to being int the "Harvey Camp".

37

182.    Stevens apologized for his misstep and stated that Filer was also "blowing up his emails" and really "bugging him about this claim as well" and he was "feeling much frustration" about the whole thing.

183.    Masse explained to Stevens that Filer's claim had not been pending since the middle of April but had been dealing with her questions about it since March and her claim on May 30th. She explained that it would have been a faster for Filer as Masse had explained to her, but Filer took it upon herself to send claim directly to the insurance company which is not the procedure as the claim page requires the HR Director's signature. Masse explained again that Filer has an issue with her due to her relationship with Harvey. She further explained that when she did start this process, she and the insurance company discovered the contract had not been amended to show the new 14-day waiting period that had changed in 2017. She further told Stevens that she felt betrayed by him due to this email potentially fitting the Council's narrative that could look like "I'm a problem". Stevens apologized again and hung up.

184.    Masse followed up with an email after the phone call and confirmed that Filer's claim had not been sent to her directly but was eventually sent by the insurance company and received by her on May 30th for signature.

185.    Masse further explained to Stevens the process of getting signatures on contracts through the City Council and that Stevens does not have the authorization to sign contracts or amendments as there needs to be authorization for the City Administrator to sign with an action from the City Council giving him that authorization. Stevens and Masse agreed the action will take some time to prepare and both Stevens and Masse were out of the office traveling for conferences. Busy schedules

coupled with the non-urgent nature of Filer's claim, it was agreed it could wait until all employees were back in the office.

186.     Masse also explained to Stevens that the Short-Term Disability Plan is fully funded by the City of Cañon City and ultimately Stevens has the authorization to approve any claim.

187.     Robyn Vidmar, Police Corporal, resigns statingshe can't work for Harvey any longer due to the poor treatment of her and the other employees.

188.     June 28, 2019 - Masse made Stevens aware of the new amendment to change the waiting period had been sent by the insurance broker, Mike McGhee, to the email of Masse. She let him know everything was ready to be sent to Council to give authority for Stevens to sign the amended contract

189.     Stevens shared his satisfaction with Masse that things were "moving along".

190.     Rebekah Nelson was promoted to Accounting Manager with responsibility over payroll and was needing her Senior Accounting Technician – Payroll position to be backfilled.

191.     Rebekah Nelson was promoted with the recommendation from the Human Resources Director Masse as she had worked closely with Nelson with payroll due the "dotted-line reporting relationship" between Payroll and Human Resources. The recommendation to promote Nelson was an easy one for Masse as she helped train Nelson and felt confident that she was a value to the department.

192.     During a day in the month of June, 2019, Masse was out with her friend, Becki Logsdon, whom she was friends with since elementary school. Each had joked

ever since being friends, that they were first "birthday twins" for having the same birthdate.

193.    Masse was sharing her frustration about her job when Logsdon asked if Masse would give her resume to the Finance Director at the City as Logsdon was seeking employment with benefits and as qualified Finance Manager and had previously applied for the Finance Director position.

194.    Masse informed Tammy Nordyke of Logsdon's extensive education and experience. Nordyke chose to hire Logsdon as the Senior Accounting Technician – Payroll and asked Masse if she felt there would be a conflict. Masse knew both Logsdon and she were professionals and did not see any conflicts.

195.    In preparation for her upcoming Independence Day vacation, Masse took the opportunity to tell Nelson and Logsdon together since they were training together on the payroll system, to explain why Filer's claims was different than other claims like pregnancy. Since no longer having an assistant, Masse thought to inform the payroll department about Filer potentially calling about her leave request since she had been so persistent up to that point. Masse wanted ensure Filer could get her questions answered while Masse was out of the office. Masse explained to Nelson and Logsdon that Masse normally approved "pregnancy with no issue" claims herself as those were straight forward from the Physician's statement. Nelson agreed and knew part of the process due to her one of the City's claims being for own pregnancy. Masse explained that Filer's claim was not due to pregnancy but instead was having hip surgery and therefore needed to go through review at the insurance company.

196.     Masse knew Nelson had access into the same medical system as she and was in the process of getting Logsdon that access.

197.     The office of Human Resources and Finance is small and with Masse's thirty years of experience in Human Resources, she understands the importance of good working relationships amongst these small close nit Financial groups and HR. Also, she knows the City Administrator and the Accounting Manager are, or should be, aware of the dotted line reporting relationship structure between the Human Resources Director and the Payroll Department.

198.     July 1, 2019 – Masse emails Harvey and copies Stevens stating the correct procedures for completing Personnel Action Forms as they continually are received from the police department with numerous errors and employees' pay is being affected and the Payroll/HR Department is spending much time correcting these errors.

199.     July 8, 2019 – Masse is asked to meet Stevens is his office. Masse initially declines as she was in a hire orientation with the new Records Clerk. Upon completion, Masse went to Stevens office where he was sitting with Hoffmann. Stevens informs Masse that she is being placed on administrative leave for "something bad". Masse clarified to Stevens, "Something bad?". Stevens continued with Masse stating that she is to return to the office the following Monday at 3:00 pm.

200.     Masse asked Hoffmann if she was being fired and if they should just "wrap things up right then" and "should she clean her office".

201.     Hoffmann encouraged that she could resign during this time.

202.    Masse clarified if he thought she should resign over "something bad"? She stated that she didn't think so and left the Stevens office to go get her personal things as she wasn't sure what would happen to them while she was gone.

203.    Masse meets with Stevens and Katheryn Sellars and records the meeting. Stevens starts by handing Masse a letter dated July 3 and addressed "To File" with the alleged reasons for her termination and states that Stevens has made the decision to fire her. Masse quickly reviews the document and see discrepancies as well as continues to "see the writing on the wall".  The letter closes that the decision for my termination was not only based on Stevens review of Masse's performance but also includes that Chief Daric Harvey and Deana Swetlik "have no confidence in her ability to do her job".

204.    Masse is very frustrated at this as part of the reason she is being terminated is not being able to "get along" with Harvey and his inability to "get along" with her but now is able to give an opinion regarding her employment?

205.    Masse was also puzzled that so much weight was given to about the opinion of a new employee, Jill Filer, who in Masse's opinion was not qualified to do the job she was currently in and needed to be terminated.

206.    Masse gets up and starts to leave the room when Sellars indicates that Masse needs to respond to the letter. Masse states that she is not comfortable as this is not the process to terminate an employee and they are not following the policy manual. Sellars disagrees with Masse and then states that Masse has 24 hours to review the document and get back to them or she is fired.

207.    Masse is completely confused by what she is talking about as Stevens just told her she was fired.

208.    July 16, 2019 – Masse texts Stevens at 3:01 stating she does not agree with the involuntary termination.

209.    July 19, 2019 – Historically and still is the policy of the City to direct deposit the last check of a terminating employee. Masse was out of the state and expecting her last check to be deposited as no communication was given to the contrary, but it did not get deposited. Masse called Stevens without an answer.

210.    Masse called Ashley Smith and asked about her check. Ashley Smith stated, "The City should pay you as a courtesy." Masse informed Smith she needed to be paid legally.

211.    Masse contacted Logsdon and she informed a manual check had mailed to her home.

212.    Despite the difficult environment, Masse performed her job responsibilities admirably as well as taking on many extra duties such as building parade float(s) for City Council, hosting the City's holiday parties at her home, cooking and baking for City employees and events, taking pictures of City events and employees as well as acquiring and painting a piano for the City. Masse earned high praises from her supervisors as well as line staff and managers of the organization. She earned merit increases higher than average increases every year she worked at the City except for the year 2019.

## CLAIM ONE FOR RELIEF
Title VII – Unlawful Employment Practices – Discrimination Based on Sex

213.    Plaintiff incorporates by reference paragraphs 1 through 210 above incorporating same by reference herein.

214.    This claim is authorized and instituted pursuant to the provisions of Title VII

of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section(s) 2000 (e) – 2, it shall be an unlawful employment practice for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's sex.

215.    Masse was subjected to inappropriate sexual behavior at the City.

216.    The inappropriate sexual behavior was unwelcome and offensive.

217.    The inappropriate sexual behavior was directed at Masse because of her gender.

### CLAIM TWO FOR RELIEF
Title VII – Sexual Harassment/Hostile Work Environment

218.    Plaintiff incorporates by reference paragraphs 1 through 215 above incorporating same by reference herein.

219.    During her employment with Defendant, Plaintiff was an adult female and was a member of a class protected under Title VII against gender-based discrimination by her supervisor.

220.    During her employment, Masse was subjected to gender discrimination including behind subjected to a hostile work environment and to adverse actions, including but not limited to, being stripped of job responsibilities, loss in a part-time staff member, and being terminated.

221.    Masse was treated less favorably than her male counterparts.

222.    The hostile work environment and adverse actions taken against Masse were motivated by her gender.

223.    Defendant's actions as described herein were willful and wanton and done with reckless disregard for Masse's protected rights.

224.    As a result of Defendant's discriminatory conduct, Masse has suffered damages.

## CLAIM THREE FOR RELIEF
Title VII – Retaliation

225.    Plaintiff incorporates by reference paragraphs 1 through 222 above incorporating same by reference herein.

226.    42 U.S.C.§ Section(s) 2000 (e) – 3 prohibits discrimination against an employee because she has "opposed any practice made an unlawful employment practice" by U.S.C. § 2000 (e) or because she has "made a charge, testified, assisted, or participated in any manner in an investigation proceeding, or hearing under [the Equal Employment Opportunities subchapter of the Civil Rights Act]."

227.    Plaintiff engaged in protected activity by making numerous complaints about sexual harassment, gender discrimination and retaliation, and otherwise engaged in activities protected under federal law, specifically Title VII.

228.    Plaintiff was subjected to adverse actions, including being subjected to a hostile work environment, being stripped of job responsibilities, being stripped of a part-time assistant, and being terminated.

229.    Plaintiff was treated less favorably than employees who did not engage in protected activity.

230.    The adverse actions taken again Plaintiff were motivated by her having engaged in protected activity.

231.    Defendant's actions as described herein were willful and wanton and done with reckless disregard for Masse's protected rights.

232.    As a result of Defendant's retaliatory conduct, Masse has suffered

damages.

## **WHEREFORE**

WHEREFORE Plaintiff Masse respectfully requests that this Court enter judgment in her favor and against the Defendants an award

(a)     injunctive and declaratory relief;

(b)     damages in such an amount as shall be proven at trial for back-pay and damages including lost benefits, wages, promotions, tenure, seniority, other employment opportunities, and damages

(c)     an order for the Defendant to reinstate Masse or in the alternative to pay front-pay and benefits, including lost benefits in an appropriate amount;

(d)     compensatory damages, including emotional distress as allowed by law;

(e)     punitive damages under Title VII

(f) attorney's fees and costs provided for by law;

(g)     pre- and post-judgment interest, costs, expert witness fess; and

(h)     such other relief as the Court deems just and proper.

## **PLAINTIFF'S SIGNATURE**

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous

argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Respectfully submitted this 12th day of April, 2021.

Stephanie L. Masse
1026 S. 10th Street
Cañon City, Colorado 81212
719/323.7252
stephmasse333@gmail.com

argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Respectfully submitted this 13th day of April, 2021.

Stephanie L. Masse
1026 S. 10th Street
Cañon City, Colorado 81212
719/323.7252
stephmasse333@gmail.com